**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Eugene LESLIE, Defendant-Appellant.**

No. 83–3719.

United States Court of Appeals,
Fifth Circuit.

April 19, 1985.

Robert Glass, New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Howat A. Peters, Jr., Harry McSherry, Fred P. Harper, Jr., Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

[Majority Opinion, 759 F.2d 366, rehearing en banc granted May 14, 1985]

Before BROWN, WILLIAMS and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge, dissenting.

I respectfully dissent from the holding that this case should be remanded for inquiry into the prosecution's reasons for exercising its peremptory challenges against black venirepersons.

*Context Facts*

Appellant Leslie was charged, along with Fernando Giron, a Honduran, with distributing and conspiring to distribute cocaine. Trial was held in New Orleans. After the first day of trial, Giron pleaded guilty and testified for the government. Other significant witnesses for the government were Claude Griffin, who testified that he had acquired cocaine from Giron and distributed it to Leslie, who then redistributed it, and Thomas Gray, who had transported cocaine from Houston to New Orleans for Griffin, received money from Leslie in exchange for the drugs, and then given the money to Griffin. Giron, Griffin, and Gray are white; Leslie is black.

The record contains no transcript of the *voir dire* or jury selection process, although it does include the jury list showing those removed for cause and by peremptory challenge. When the court completed excusing venirepersons for cause, the jury panel had been reduced to twenty-eight, of whom six were black. The government used its six peremptory challenges to remove these six blacks, and the defense used its ten peremptory challenges to remove ten whites. Of the four persons comprising the alternate pool, one was black; the government used its alternate peremptory to remove this individual, and the defense used its alternate peremptory to remove a white from the alternate pool. The procedure and order of exercising peremptory strikes are not reflected in the record.

After the peremptories were completed, Leslie's counsel moved for a mistrial. He complained that the government used its peremptories to remove all the blacks from the jury and alternate pools, and that "in this case, Mr. Leslie is a black man in this community; he has standing in the black community. And without a single black on that jury, there is no way to communicate through peers in this community." Leslie's counsel in effect admitted that there was no racially discriminatory "pattern or practice" of striking blacks, did not claim that anything similar had ever occurred before or would occur again, and made no attempt to analyze or comment on the *voir dire* or the composition of the venire panel in any terms other than who was black and who was white. He stated that "race is the only thing that explains this situation," and urged use of "the Court's discretion." The Assistant United States Attorney who tried the case for the government stated that the excused blacks were "not struck on the basis of race" and offered to give "an in camera reason," which the court declined. The matter was not raised again in the trial court, either by motion for new trial or otherwise.

On appeal, Leslie's brief casts his complaint in the following context:

"Eugene Leslie, a prominent black fight promoter and trainer in the City of New Orleans, was tried by an all white jury ... on cocaine conspiracy and distri-

bution charges.... No significant witness against Leslie was black....

"The government's theory was that Claude Griffin ... had bought cocaine from a Honduran, Leslie's co-indictee Fernando Giron, in Houston, Texas. Griffin sold a part of the cocaine to defendant Leslie....

"FBI agents ... intercepted phone calls between Griffin and Leslie. These telephone calls did not mention cocaine. The calls, however, sounded suspicious to FBI ears since Leslie had repetitively and in varying forms asked Griffin whether there was 'anything yet.'

"The defense presented an entirely innocent explanation for the style of the conversations with Griffin: it was typical for Leslie, a black man, to speak in shorthand about things which he and the other individual in the conversation understood....

"Leslie explained the true meaning of his conversations with Griffin in the following manner. Leslie had first met Griffin in Griffin's capacity as an air conditioning repairman and installer. They struck up a friendship; Leslie visited Griffin, and Griffin visited Leslie. At Griffin's house, Leslie met the co-indictee, Fernando Giron, who was from Honduras. Giron had a relative who possessed an old Volkswagen; Leslie had a hobby of reconditioning old cars, and was interested in that Volkswagen. Additionally, Griffin and Giron talked about young Honduran fighters, and the possibility of their coming to the United States for training; Leslie, ever ready for the opportunity to train a champion, was interested in developing that connection.

"....

"Along with the suspicious conversations of Leslie with Griffin, the FBI had recorded similarly suspicious conversations by Griffin with another prominent black man in the city, the funeral director Alton Glapion. Glapion was a closer friend of Griffin's than was Leslie. Griffin had known Glapion for 20 years, Leslie for under two.... Griffin was then involved in major business dealings with Glapion and Glapion was ready, willing and able to put up his funeral home for bond for Griffin; Leslie on the other hand owed Griffin money.... It was the defense theory of the case ... that when Griffin said the oil conversations with Leslie were about cocaine, while the oil conversations with Glapion were about oil, ... that he had made a self-preserving choice; Griffin had given up the innocent Leslie to protect the also innocent Glapion in order to preserve his credibility, and thereby to save himself and his family, who were indicted along with him, from certain annihilation by the government.[1]

"....

"... To acquit the defendant Leslie, a black fight promoter from New Orleans, the jury had to be open to the possibility that Leslie had spoken to Claude Griffin, the principal prosecution witness, in a shorthand that was not code for cocaine. There was no black juror to explain to the rest of the jurors in their deliberations that there was nothing irregular about Leslie's speech patterns; to mediate between Leslie's lifestyle and that of the white jurors; or to evaluate the credibility of the defense from the black perspective."

It is implicit in the foregoing that Leslie does not complain that he was tried by a prosecutor or jury that bore any racial ani-

---

**1.** Leslie's brief elaborates on this point as follows:

"In other words it was the belief of the defense that Griffin, faced with similarly suspicious intercepted telephone conversations from his two black friends, Glapion and Leslie, could not say that both of them were innocent of wrongdoing, even though that were true. Griffin could not exculpate both of his black friends, and still be believed to the extent that he would receive misdemeanors for his involved family members, and his single count deals.... He was forced to choose, and so chose his greater friend, Glapion, over his lesser friend, Leslie. Griffin therefore implicated Leslie, as the least of the horribles with which he had to contend and choose."

mosity toward him or blacks generally.[2] Rather, he complains that, because of the peculiar factual setting of this case, he needed one or more black jurors to "translate" his speech and conduct to the rest of the jury; in effect, to vouch for his explanation of the suspicious conversations and activities.[3] It is likewise implicit that Leslie has never contended that the prosecution peremptorily struck black venirepersons because of personal or official hostility toward blacks, or as part of an effort to prevent black citizens from serving on criminal juries. Rather, the prosecution apparently made the strikes simply in an effort to procure, from among those summonsed and not disqualified, a jury which, under the discrete facts of this particular case, would least likely be partial to Leslie, by excluding blacks as individuals either most prone to see their role as that of translator or spokesman for Leslie or perhaps as being particularly susceptible to influence on behalf of one so prominent in the black community. This is also apparent from Leslie's statement in his brief, repeated in substance at oral argument, that:

> "Indeed, there is no pattern or practice in the United States District Court for the Eastern District of Louisiana which could be proved up by a systematic and exhaustive examination of the peremptory practices of the prosecutors. Black jurors are no less prosecution oriented in most cases than are jurors of other races."

## The Issue

Accordingly, the question here is not whether the prosecution may peremptorily challenge blacks in an effort to deny citizens of that race the right and privilege of serving on criminal juries. *Nor* is it what character of proof suffices to sustain such a claim, *prima facie* or otherwise. No such claim is made. Rather, the issue here is whether the prosecution may take race or similar group characteristics into account when it exercises a peremptory challenge for the sole purpose of procuring a jury least likely to be partial to the defense, in light of the discrete facts of the particular case being tried.

## Swain v. Alabama

I believe the answer to this question is clearly supplied by part II of the Supreme Court's opinion in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). As in this case, the prosecution in *Swain* peremptorily struck all six black venirepersons on the jury panel, with the result that the black defendant was tried by an all-white jury. *Swain* is, of course, a much cited and quoted opinion. But it is perhaps worthwhile to take another look.

So far as it concerned peremptory challenges by the prosecution based on race or similar group membership, *Swain* distinguished between and dealt separately with *two* types of such challenges: *first,* those made for the purpose of the particular case being tried, which it addressed in part II; *second,* those made "for reasons wholly unrelated to the outcome of the particular case on trial ... to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population" (*id.* at 838), which it considered in part III. The distinction between the two categories of racially based peremptory challenges is likewise reflected in the description of the second type as being the kind the prosecution would make "whatever the circumstances, whatever the

---

**2.** Indeed, were that the case Leslie would hardly have said, as he did in his brief, that
> "[t]here are two serious issues before the court. The first involves the government's misuse of plea bargain letters to bolster and vouch for its witnesses. The second involves the refusal to allow the defense to prove a motive to lie on the part of a principal prosecution witness, when that witness denied the existence of the motive. Both of these issues are intricately connected with the disputed facts in the four day trial in which 20 witnesses testified."

**3.** Leslie's brief describes this as "a case where the black defendant's mode of conversation, position in the community and lifestyle required translation to the jury for the defense to be credibly received."

crime and whoever the defendant or the victim may be." *Id.* at 837. In *Swain* part II, the Court held that racially based peremptory challenges of the first kind were a proper and a traditional part of the jury system as known to the common law and American jurisprudence. In its part III, the *Swain* Court strongly intimated that racially based peremptory challenges of the second kind were improper, but did not expressly rule that they were since it held that no sufficient showing had been made that the challenges in question were of that kind.

Justice Goldberg, joined by Chief Justice Warren and Justice Douglas, dissented. *Id.* at 840–50.[4] The dissent, however, found no fault with part II of *Swain* or its holding respecting the first type of race-based peremptory challenge. Rather, the dissent took the view that a proper *prima facie* case was made that the race-based peremptory challenges were of the second kind. The dissent emphasized that the Alabama venire selection system, which relied in large part on subjective choices by individual jury commissioners, produced venires in the county of trial that averaged ten to fifteen percent black, although blacks constituted twenty-six percent of the population available for jury service; and that "this method of venire selection cannot be viewed in isolation and must be considered in connection with the peremptory challenge system." *Id.* at 845. They particularly noted "it is undisputed that no Negro has ever served on any petit jury in" the county. *Id.* The dissent summarized its views by stating:

"The holding called for by this case, is that where as here, a Negro defendant proves that Negroes constitute a substantial segment of the population, that Negroes are qualified to serve as jurors, and that none or only a token number has served on juries over an extended period of time, a prima facie case of the exclusion of Negroes from juries is then made out; ... and that the State wholly fails to meet the prima facie case of systematic and purposeful racial discrimination by showing that it has been accomplished by the use of a peremptory challenge system unless the State also shows that it is not involved in the misuse of such a system *to prevent all* Negroes from *ever* sitting on *any jury*. Such a holding would not interfere with the rights of *defendants* [emphasis in original] to use peremptories, nor the right of the State to use peremptories as they normally and traditionally have been used.

"It would not mean ... that Negroes are entitled to proportionate representation on a jury.... Nor would it mean that where systematic exclusion of Negroes from jury service has not been shown, a prosecutor's motives are subject to question or judicial inquiry when he excludes Negroes or any other group from sitting on a jury in a particular case. *Only* where *systematic* exclusion has been shown, would the State be called upon to justify its use of peremptories or to negative the State's involvement in discriminatory jury selection." *Id.*, at 849 (footnote omitted; emphasis added).[5]

4. Justice Harlan joined in the Court's opinion, but emphasized his understanding that the Court did not ultimately decide whether or not the second type of race-based peremptory challenge, addressed in part III, was improper. *Id.* at 840. Justice Black concurred in the result without opinion. *Id.*

5. Certain scholarly comment has given a similar reading of *Swain*. *See* Saltzburg and Powers, *Peremptory Challenges and the Clash Between Impartiality and Group Representation*, 41 Md. L.R. 337, 345 (1982):

"The *Swain* Court thus recognized two possible motives for exercising challenges against

black jurors. The first—the use of race as a proxy by which to identify probable prejudice in a particular case—was explicitly approved by all the justices, except Justice Black who concurred in the result without opinion. The Court emphasized the importance of protecting the inviolability of the peremptory strike, concluding that a court should not scrutinize a prosecutor's motive for challenging blacks in a particular case. The second—the use of challenges to keep blacks off all juries—was not approved."

*See also United States v. Newman*, 549 F.2d 240, 248–49 (2d Cir.1977) (quoting *Swain* dissent and discussing common strains in the majority and

The Eighth Circuit has observed, "The very heavy burden of proof set forth in *Swain* has been extensively criticized by commentators." *United States v. Childress*, 715 F.2d 1313, 1316 (8th Cir.1983) (en banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984). In a related vein, it has also been stated that "*Swain* obviously furnishes no protection whatever to the first defendant who suffers such discrimination in any given court." *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 908, 583 P.2d 748, 767 (1978).[6] What these concerns are directly relevant to, though, is the proof required to sustain a claim that the prosecution's exercise of peremptory challenges is of the second *Swain* kind. Here, as noted, we are not concerned with how such a claim is or should be proved, because no such claim is asserted. What we *are* concerned with is a claim of racially based peremptory challenges of the first *Swain* kind.

We turn then to *Swain* part II for an understanding of the holding—from which no Justice on that Court, then well past a decade under the leadership of Chief Justice Warren, dissented—that this sort of peremptory challenge is valid. Justice White commenced by stating that the defendant's motion "seeking as it did to invalidate the alleged purposeful striking of Negroes from the jury ... was properly denied." *Id.* 85 S.Ct. at 831. He noted that "there is merit in" the state's contention that the system of peremptory strikes, described as "challenges without cause, without explanation and without judicial scrutiny," justified "striking any group of otherwise qualified jurors in any given case, whether they be Negroes, Catholics, accountants or those with blue eyes." *Id.*

The opinion traces the over 600-year-old history of the peremptory challenge at common law, observing that in one form or another "[p]eremptories on both sides became the settled law of England" and that "[t]his common law provided the starting point for peremptories in this country." *Id.* at 832. The opinion further traces the continuous existence, from the beginnings of this nation, of some form of peremptory challenge, in all trials of serious offenses, by both prosecution and defense in the federal system and in all or nearly all of the states. *Id.* at 832–34. The majority took note of the existence of explicit statutory recognition of the government's right of peremptory challenge in federal courts ever since 1865. *Id.* at 832–33. Although he recognized that the United States Constitution does not mandate the availability of peremptory challenges,[7] Justice White stated that "[t]he persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury." *Id.* at 835.[8]

The opinion continues by noting:

"The function of the challenge is not only to eliminate extremes of partiality

---

dissenting opinions); *United States v. Childress*, 715 F.2d 1313, 1315 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984) (comparing the majority and dissenting opinions, and the extent to which they agree).

**6.** Much the same thing, of course, could be said of any approach under which a material factor in the judgment in a particular case is an evaluation of the results in other similar situations over a period of time. Performance over time frequently has been looked to in venire underrepresentation cases. *See* cases and principles discussed in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 3005, 3007, 3009, 61 L.Ed.2d 739 (1979). *Cf. Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 860 nn. 1–2, 871 n. 11, 83 L.Ed.2d 841 (1985) (Brennan, J., dissenting; observations relating to consistent affirmance of convic-

tions by death-qualified juries and more recent evidence of their conviction-proneness).

**7.** While several other Supreme Court opinions have also so stated, *see Stilson v. United States*, 250 U.S. 583, 40 S.Ct. 28, 30, 63 L.Ed. 1154 (1919); *United States v. Wood*, 299 U.S. 123, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936); *Frazier v. United States*, 335 U.S. 497, 69 S.Ct. 201, 206 n. 11, 93 L.Ed. 187 (1949), the Court has never been faced with a complete abrogation of the peremptory challenge.

**8.** *See Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892) ("The right of [peremptory] challenge comes from the common law with the trial by jury itself, and has always been held essential to the fairness of trial by jury.").

on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence, placed before them, and not otherwise." *Id.* at 835.

It also explains that "the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable" than is required for challenges for cause. *Id.* at 836.[9] Another function of the peremptory is that it "facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." *Id.* at 835. The state is as fully entitled to these benefits as the defendant:

"[T]he view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' Hayes v. State of Missouri, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 [1887]." *Id.*

As to use of peremptories on the basis of the racial or other group-related, as opposed to individual, characteristics of the challenged venireperson, *Swain* states that:

"It [the peremptory challenge] is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. It is well known that these factors are widely explored during the *voir dire*, by both prosecutor and accused .... This Court has held that the fairness of trial by jury requires no less.... Hence veniremen are not always judged solely as individuals for the purpose of exercising peremp-

tory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

"... In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory ....

"... The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes." *Id.* at 836–37 (footnotes omitted).

This language is, of course, wholly at odds with the theory of such cases as *People v. Wheeler, supra,* and *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, 514–15, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979), that a venireperson may not properly be peremptorily challenged because of characteristics thought to be peculiarly common to any "cognizable" group of which she is a member, as distinguished from her assumed uniquely individual (or noncognizable group) characteristics. Plainly, the Supreme Court in *Swain* has held that a prosecutor may peremptorily challenge on racial (or similar group) grounds so long as he does so, as Leslie in essence claims was done here, on "considerations related to the case he is trying, the particular defendant

---

**9.** A related, long-recognized common-law function noted by Justice Story is that the prisoner "may not be tried by persons against whom he has conceived a prejudice." *United States v.*

*Marchant & Colson,* 12 Wheat 480, 482, 6 L.Ed. 700, 700 (1827). *See also Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892).

involved and the particular ·crime charged." *Swain,* 85 S.Ct. at 837.

In sum, as the Eighth Circuit said in *United States v. Carter,* 528 F.2d 844, 850 (8th Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1976), "the Supreme Court in *Swain* made it clear that race or other group affiliation is in fact a legitimate ground for challenge in an individual case." [10]

### Swain *and the Sixth Amendment*

It has been suggested that *Swain* is no longer authoritative, or at least is not authoritative with respect to cases in which the sixth amendment is implicated, because it was decided some three years before it was first held, in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), that the sixth amendment applied to the states.[11] In this connection, it is claimed that the racially based peremptory challenges of the kind sustained in *Swain* part II violate the sixth amendment's "cross-section requirement," particularly as reflected in cases such as *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). *See McCray v. Abrams,* 750 F.2d 1113, 1124–30 (2d Cir.1984), *reh'g en banc denied,* 756 F.2d 277 (2d Cir.1985).

Certainly no such view is open to adoption by this panel. This Court consistently has applied *Swain* in federal prosecutions, even where it has been obvious that the sixth amendment is applicable. Thus, we stated in *United States v. Williams,* 446 F.2d 486, 488 (5th Cir.1971):

"Appellant next contends that he was denied his constitutional right to a trial by an impartial jury. Appellant, a Negro, was tried by an all-white jury.... He objects, however, to the fact that although there were three Negroes on the twenty-eight-man jury venire, all three were peremptorily stricken by the Government prosecutor without cause or explanation, in violation ˙of his Sixth Amendment rights. Such a contention conflicts with the holding of Swain v. State of Alabama ... in which the Supreme Court upheld the system of peremptory challenges, explicitly finding merit in the State's argument that the system affords 'a suitable and necessary method of securing juries which in fact and in the opinion of the parties are fair and impartial.' "

**10.** Similarly, we have said "the Supreme Court has recognized that the peremptory challenge cannot be subject to judicial review even when exercised by the prosecution along racial lines." *Sorenson v. Raymond,* 532 F.2d 496, 500 (5th Cir.1976) (citing *Swain* part II). This, of course, is the recognized view. *See, e.g., United States v. Thompson,* 730 F.2d 82, 85 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 443, 83 L.Ed.2d 369 (1984) (prosecution peremptory challenges of blacks from venire confessedly "based on the assumed racial affinity of these prospective jurors to designated black alibi witnesses" is sanctioned by *Swain* and does not violate the sixth amendment; *United States v. Clark,* 737 F.2d 679, 682 (7th Cir.1984) ("[t]he Supreme Court held some years ago that it is not a denial of the equal protection of the laws for a prosecutor to base peremptory challenges on racial grounds, provided that he is not doing so in pursuance of a systematic policy of racial exclusion from juries," citing *Swain*); *United States v. Newman,* 549 F.2d 240, 249 (2d Cir.1977) (proper peremptory under *Swain* where prosecutors " 'believed that the striking of Black veniremen would lessen the risk of bias in favor of the [black] defendant' "); *United States v. Danzey,* 476 F.Supp. 1065, 1066 (E.D.N.Y.1979), *aff'd per curiam,* 620

F.2d 286, *reh'g en banc denied,* 622 F.2d 1065, 1066 (2d Cir.), *cert. denied,* 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980) (peremptory challenges "to exclude jurors of the same ethnic background as the defendant"; four judges concurring in denial of rehearing en banc state that "use of peremptory challenges based on a group bias assumption denies no cognizable legal rights 'in any particular case,' " citing *Swain,* though it might do so if used "to exclude Blacks from service as jurors in general or in a significant category of cases"); *King v. County of Nassau,* 581 F.Supp. 493, 500 (E.D.N.Y.1984) ("under *Swain,* state use of racial criteria in making peremptory challenges is illegal only when the state, acting on a policy of white dominance, attempts to keep blacks off *all* juries" (emphasis in original)); *State v. Grady,* 93 Wis.2d 1, 286 N.W.2d 607, 611 (Wis.Ct.App.1979) ("*Swain,* as adopted, establishes race as an appropriate basis for the exercise of peremptory challenges").

**11.** In *DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (per curiam), the Court held that *Duncan* was inapplicable to cases in which trial began prior to May 20, 1968, the date *Duncan* was decided.

Other decisions of this Court applying *Swain* in federal prosecutions include: *Davis v. United States*, 374 F.2d 1, 5 (5th Cir.1967); *United States v. Pearson*, 448 F.2d 1207, 1213–14 (5th Cir.1971); *United States v. Carlton*, 456 F.2d 207, 208 (5th Cir.1972) (per curiam). We have continued with like holdings after *Taylor*. *See e.g.*, *United States v. Durham*, 587 F.2d 799, 801 (5th Cir.1979); *United States v. McLaurin*, 557 F.2d 1064, 1076 (5th Cir.), *cert. denied sub nom. Hamilton v. United States*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978). In affirming the conviction in *McLaurin*, we stated:

> "They [appellants] argue that ... the government exercised its peremptory challenges in a racially discriminatory manner, the net effect of which was to deny the appellants their right to be tried by a jury which is *representative of their community.*
>
> "... Although *Swain* of course involved state rather than federal proceedings, *we apply the same standards and analysis in* our review of *federal criminal trials.*" *Id.* at 1076 (emphasis added; footnote omitted).

Likewise, we have continued to apply *Swain* to our consideration of habeas corpus applications arising from state convictions in trials after *Duncan* and *Taylor*. *See Easter v. Estelle*, 609 F.2d 756, 759–60 (5th Cir.1980); *Prejean v. Blackburn*, 743 F.2d 1091, 1103–04 (5th Cir.1984). In *Prejean* we followed this course despite explicit recognition of the opinions on the denial of certiorari in *McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). We cited with approval the Elev-

enth Circuit's opinion in *Willis v. Zant*, 720 F.2d 1212, 1217–21 (11th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984), in which that Circuit stated (720 F.2d at 1219 n. 14), "[W]e decline petitioner's invitation to extend the sixth amendment's cross-section analysis under *Taylor, supra*, to the traverse jury itself." *See Prejean*, 743 F.2d at 1104 & n. 11. *See also Sonnier v. Maggio*, 720 F.2d 401, 407–08, *reh'g en banc denied*, 723 F.2d 907 (5th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984).

In its referenced holdings, our Court is consistent with a vast host of decisions by other Circuits which apply *Swain* in federal prosecutions and in habeas cases for state trials after *Duncan* and *Taylor*. No useful purpose would be served by citing all of these cases. Some pre-date *Swain* itself, such as *Hall v. United States*, 168 F.2d 161 (D.C.Cir.), *cert. denied*, 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948), where the *dissent* was expressly grounded on the theory that the jury must be drawn from a cross section, with no cognizable group intentionally excluded, and that the federal courts should ensure this by use of supervisory powers over peremptory challenges. *Id.* at 165–66. *Hall* was cited with approval in *Swain*, 85 S.Ct. at 836 n. 26, and also by this Court in *Carlton*, 456 F.2d at 208. Some of the more recent federal appellate decisions to the same effect are collected in the dissent in *McCray v. Abrams*, 750 F.2d at 1136.[12] *McCray* appears to be the sole federal appellate decision reaching a con-

---

12. These are *Willis v. Zant*, 720 F.2d 1212, 1219 n. 14 (11th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984); *United States v. Childress*, 715 F.2d 1313 (8th Cir.1983) (en banc), *cert. denied*, — U.S. —, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *United States v. Whitfield*, 715 F.2d 145, 146–47 (4th Cir.1983); *Weathersby v. Morris*, 708 F.2d 1493, 1497 (9th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984); *United States v. Canel*, 708 F.2d 894, 898 (3d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 165, 78 L.Ed.2d 151 (1983); *United States v. Jenkins*, 701 F.2d 850,

859–60 (10th Cir.1983). *See also United States v. Newman*, 549 F.2d 240, 244, 246 (2d Cir.1977); *United States v. Danzey*, 476 F.Supp. 1065, 1067 (E.D.N.Y.1979), *aff'd per curiam*, 620 F.2d 286, *reh'g en banc denied*, 622 F.2d 1065 (2d Cir.), *cert. denied*, 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980); *United States v. Thompson*, 730 F.2d 82, 85 (8th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 443, 83 L.Ed.2d 369 (1984); *United States v. Clark*, 737 F.2d 679, 681–82 (7th Cir.1984); *United States v. Calhoun*, 542 F.2d 1094, 1103 (9th Cir.1976).

trary result, albeit over a vigorous dissent.[13]

Before the 1978 decision in *People v. Wheeler*, the state courts had been unanimous in following the principle of *Swain*. *See* Annot., 79 A.L.R.3d 14 (1977). *Wheeler* itself, though it gives extensive consideration to decisions of the United States Supreme Court, is ultimately based on the California Constitution. The California Supreme Court stated:

"The court's motivation in *Swain* seems to have been its desire to avoid what it believed would be 'a radical change in the nature and operation of the [peremptory] challenge' (380 U.S. at pp. 221–222, 85 S.Ct. at p. 836), and we strongly suspect that desire has survived the advent of the *Taylor* rule. We therefore assume that if the present question were before the high court it would reaffirm *Swain* and reach the same result under the representative cross-section rule as it did under the equal protection clause." 583 P.2d at 767 (footnote omitted).[14]

Other states that have followed *Wheeler* have likewise based their decision on local law. *See Commonwealth v. Soares, supra; State v. Neil*, 457 So.2d 481, 486 (Fla.1984). *See also State v. Crespin*, 94 N.M. 486, 612 P.2d 716, 718 (N.M.Ct.App. 1980) (construing New Mexico Constitution).[15]

However, the *Swain* approach remains the overwhelming majority rule among the states. Justice Marshall, dissenting from the denial of certiorari in *Gilliard v. Mississippi*, —— U.S. ——, 104 S.Ct. 40, 43, 78 L.Ed.2d 179 (1983), observed:

"To my knowledge, in the five years since *Wheeler* and *Soares*, not a single state supreme court has imposed state constitutional limits on peremptory challenges. In fact, over the same period, at least 19 jurisdictions have considered the issue and, following *Swain*, reaffirmed their view that the exclusion of Negroes by peremptory challenges is constitutional in the absence of evidence of systematic exclusion." (Footnotes omitted.)[16]

Moreover, when *Swain* was decided the cross-section principle already had long been established, and was indisputably applicable to the states at least as it pertained to the *Swain* context, namely, a black challenging his conviction on the ground that the jury selection procedures tended to reduce the presence of blacks in the venire and on the jury below the level of a representative cross section. Thus, Justice White stated for the Court in *Taylor*:

"A unanimous Court stated in Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940), that '[i]t is part

---

**13.** As reflected in the opinions on denial of rehearing en banc, *McCray's* precedential value is undermined "by the lack of adversity between the litigants on the central issue in the case," leading at least one member of the Second Circuit to view it as not binding on future panels of that Court. *McCray v. Abrams*, 756 F.2d 277, 278 (2d Cir.1985).

**14.** The *Wheeler* opinion also observes that Justice White is the author of both *Swain* and *Taylor*. *See Wheeler*, 583 P.2d at 767 n. 33.

**15.** *Crespin's* actual holding is that the prosecution's peremptory challenge of the sole black on the venire did not authorize the trial court to require the prosecutor to state a reason for the challenge, and such a case "is controlled by both the analysis and the concern raised in *Swain*," although the opinion goes on to say that if an unspecified greater number of challenges had been so utilized, the "*Wheeler—Soares* rationale" would apply by virtue of the New Mexico Constitution. 612 P.2d at 717, 718.

**16.** The state decisions which have considered and rejected *Wheeler* and *Soares* are cited in footnote 3 to Justice Marshall's dissent. 104 S.Ct. at 43 n. 3. *See also* cases cited in *State v. Neil*, 457 So.2d 481, 484 n. 3 (Fla.1984), and in *People v. Williams*, 97 Ill.2d 252, 73 Ill.Dec. 360, 454 N.E.2d 220, 233 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984). For earlier decisions *see* Annot., 79 A.L.R.3d 14 (1977). Since Justice Marshall wrote, Florida has switched from anti- to pro-*Wheeler—Soares*, *see State v. Neil, supra*, Maryland can likely be considered as in the undecided, rather than the anti-*Wheeler—Soares*, faction, *see Lawrence v. State*, 295 Md. 557, 457 A.2d 1127, 1133 (1983), and Indiana has joined the ranks of those rejecting *Wheeler—Soares*. *See Hobson v. State*, 471 N.E.2d 281, 285–86 (Ind.1984). Nevertheless, Justice Marshall's statement remains essentially correct: the overwhelming weight of authority in the states rejects *Wheeler* and *Soares*. Moreover, this rejection is spread throughout all the major geographic regions of our nation.

of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' To exclude racial groups from jury service was said to be 'at war with our basic concepts of a democratic society and a representative government.' A state jury system that resulted in systematic exclusion of Negroes as jurors was therefore held to violate the Equal Protection Clause of the Fourteenth Amendment.

"... In *Brown v. Allen*, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953), the Court declared that '[o]ur duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.'

" ....

"The unmistakable import of this Court's opinions, at least since 1940, Smith v. Texas, *supra*, and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." 95 S.Ct. at 696–97.[17]

I also observe that *Swain* part II is largely based on an analysis of the current and historical role of the peremptory challenge in the common law and American

jury system generally. It particularly relies on federal criminal cases, such as *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892); *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894); *Harrison v. United States*, 163 U.S. 140, 16 S.Ct. 961, 41 L.Ed. 104 (1896); *Miles v. United States*, 103 U.S. 304, 26 L.Ed. 481 (1881); and *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). The opinion likewise carefully traces the history of the use of the peremptory challenge in federal criminal trials up to 1965. Accordingly, it stands *Swain* on its head to suggest that it could be consistent with a holding that the sixth amendment's guarantee of "trial, by an impartial jury," or the requirement of article III, section 2, clause 3, that "trial of all [c]rimes ... be by [j]ury," forbids or militates against the kind of peremptory challenge approved in *Swain* part II. *Swain*'s approval of one type of racially based peremptory strike was based on the premise that the type of peremptory challenge there sustained was an integral and recognized part of such a jury trial. The equal protection clause was thought not to forbid what was so clearly authorized as a significant part of the constitutionally required jury trial.

Moreover, the cross-section principle is inapplicable to the kind of group-based peremptory challenge dealt with in *Swain* part II. To begin with, the cross-section cases

**17.** This is not to say that application of the sixth amendment to the states added nothing to the jury selection question. Rather, what it added is not material in the *Swain* context. For example, the sixth amendment allows one not a member of the underrepresented class to complain, *Taylor*, while this result is, or rather at least was, less clear under the equal protection clause. *See Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 2168–69, 33 L.Ed.2d 83 (1972). Further, where the underrepresented group is not a racial one, the sixth amendment's protection may be stronger than that of the equal protection clause. *See Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Hoyt v. Florida*, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). But *Swain* involved a black defendant claiming underre-

presentation of his race. Finally, under the equal protection clause the statistical case is only *prima facie*, and may be rebutted by a sufficiently strong showing of lack of discriminatory intent or determinative effect, while under the sixth amendment the response to the same threshold showing must be one of "adequate justification." *Duren*, 99 S.Ct. at 670 n. 26. This is not material in the *Swain* context where the question was *whether* a threshold showing had been made.

It may also be noted that this Court has likewise long been sensitive to the cross-section principle. *See* the various opinions in *Rabinowitz v. United States*, 366 F.2d 34, 57–58, 77–79, 83 (5th Cir.1966) (Rives, J.; Brown, J., concurring; Bell, J., dissenting in part). This has not prevented us from applying *Swain* to federal cases or post-1968 state habeas cases.

are largely couched in terms of *systematic* exclusion. Further, the cross-section principle is applied to the formation of the venires, not the individual juries selected from them.[18] Thus, in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972), Justice White stated:

> *"All that the Constitution forbids*, however, *is systematic* exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been *systematically* excluded. See Swain v. Alabama, 380 U.S. 202, 208–209, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965) ...." (Emphasis added.)

**18.** It has been suggested that *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), indicates that the cross-section requirement is applied at the jury, as well as the venire, selection level. *McCray v. Abrams,* 750 F.2d at 1129. I am not persuaded.

To begin with, we have consistently held that in capital cases peremptory challenges may be used to exclude those who express hesitancy about imposing the death penalty but whose exclusion for cause is forbidden by *Witherspoon. See Jordan v. Watkins,* 681 F.2d 1067, 1070 & n. 2 (5th Cir.1982) (citing *Swain*); *Sonnier v. Maggio,* 720 F.2d 401, 406–07, *reh'g en banc denied,* 723 F.2d 907 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984) (citing *Swain*). *See also Dobbert v. Strickland,* 718 F.2d 1518, 1525 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984) (same). *Cf. Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985) (en banc) (challenge for cause, but *not* peremptory challenge, of *Witherspoon* excludables violates the cross-section requirement on the guilt or innocence issue in capital case).

Justice Brennan (Justice Marshall concurring) has noted that allowing challenge for cause in a capital case where the requirements of *Witherspoon* have *not* been met violates the jury cross-section cases, stating: "Though these cases involve systematic exclusion from the jury pool and not from a particular jury, death-qualification is the functional equivalent of exclusion from the pool. The prosecution has *unlimited* ability to challenge prospective jurors for cause and uses the challenges to remove *all* members of an identifiable segment of the community *from the pool." Wainwright v. Witt,* —— U.S.

Similarly, in *Taylor*, Justice White stated for the Court:

> "If the fair-cross-section rule is to govern the selection of juries, as we have concluded it must, women cannot be *systematically* excluded *from jury panels from which petit juries are drawn.*
>
> " . . . .
>
> "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community *we impose no requirement that petit juries actually chosen must* mirror the community and *reflect the various distinctive groups in the population.* Defendants are not entitled to a jury of any particular composition ... but the *jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically* exclude distinctive groups in the communi-

——, 105 S.Ct. 844, 870 n. 10, 83 L.Ed.2d 841 (1985) (dissenting opinion) (emphasis added). Obviously, these remarks are inapplicable to peremptory challenges.

Further, where a particular ground of challenge for cause (such as opposition to the death penalty) is recognized by state law, this has an inherently systematic effect not present in the peremptory challenge exercised on an individual case basis (*i.e.,* of the *Swain* part II variety).

Moreover, *Witherspoon*'s reliance on the cross-section approach has been deemphasized, while the broad discretion afforded juries in death penalty cases at that time has been seen as a particularly important factor in *Witherspoon. See Wainwright v. Witt,* 105 S.Ct. at 851, 852 n. 5. And, obviously, the result in *Witherspoon* and succeeding cases has been heavily influenced by the uniqueness of the death penalty.

Finally, *Witherspoon* and its progeny have recognized that the exclusion of "*Witherspoon*-excludables" is acceptable, though obviously that has adverse "cross-sectional" effects. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978); *Wainwright v. Witt, supra.* Except for *Grigsby,* every appellate decision has held that this is so even as to the guilt or innocence stage. *See Lockett, supra; Smith v. Balkcom,* 660 F.2d 573, 578–83 (1981), *modified in other respects, reh'g en banc denied,* 671 F.2d 858 (5th Cir.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 592, 594–95 (5th Cir.1978), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979); *Sonnier,* 720 F.2d at 407–08; *Keeten v. Garrison,* 742 F.2d 129, 133–34 (4th Cir.1984).

ty and thereby fail to be reasonably representative thereof." 95 S.Ct. 692 at 699, 702 (emphasis added).

And, in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), Justice White again speaking for the Court said:

"In order *to establish a prima facie violation of the fair-cross-section requirement, the defendant must show* (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that *the representation of this group in venires* from which juries are selected *is not fair* and reasonable in relation to the number of such persons in the community; and (3) that *this underrepresentation is due to systematic* exclusion of the group in the jury-selection process.

" . . . .

"Finally, in order to establish a prima facie case, it was *necessary* for petitioner to show that the underrepresentation of women, *generally and* on his venire, was due to their *systematic* exclusion in the jury-selection process." *Id.* at 668–69 (emphasis added).

*See also Rabinowitz v. United States*, 366 F.2d 34, 59 (5th Cir.1966) ("The focus of the law is on the list from which the jury is drawn and not on the composition of a particular jury . . . .").

Plainly, then, the cross-section theory does not speak to the use of peremptory challenges of the *Swain* part II variety. They are not systematic, and they do not relate to the formation of the venires.

The argument has been made that restricting the cross-section requirement to the venire selection process is meaningless, because juries decide cases while venires decide nothing. *See McCray*, 750 F.2d at 1128. This contention, however, ignores the vast difference in function and purpose between selection for a venire and selection for a jury. Exclusion from the venire summons process implies that the government (usually the legislative or judicial branch) in its capacity as the neutral structurer of the overall justice system has generally determined that those excluded are unfit to try *any* case. Exercise of the peremptory challenge, by contrast, represents the discrete decision, made by one of two or more opposed *litigants* in the trial phase of our adversary system of justice, that the challenged venireperson will be more unfavorable to that litigant in that *particular case* than the others on the same venire.

Thus, excluding a particular cognizable group from all venire pools is stigmatizing and discriminatory in several interrelated ways that the peremptory challenge is not. The former singles out the excluded group, while individuals of all groups are equally subject to peremptory challenge on any basis, including their group affiliation. Further, venire-pool exclusion bespeaks *a priori* across-the-board total unfitness, while peremptory-strike exclusion merely suggests potential partiality in a particular isolated case. Exclusion from venires focuses on the inherent attributes of the excluded group and infers its *inferiority*, but the peremptory does not. To suggest that a particular race is unfit to judge in any case necessarily is *racially insulting*. To suggest that each race may have its own special concerns, or even may tend to favor its own, is not. For instance, it says nothing adverse, or even truly racial, about blacks to infer that they may be more likely to have greater antipathy to the Ku Klux Klan than whites. Finally, the role played by the decision maker is significant. If the neutral structurer of the system excludes a cognizable group, the exclusion necessarily represents the official judgment of *society* that the group is generally inferior. Under the adversary framework of a trial, however, *society* is neutral; neither side is favored, neither speaks for society, each speaks only for itself. To be peremptorily challenged by one side or the other hence bespeaks a judgment which is neither societal nor even normative, but merely reflects the tactical determination of one contesting litigant's counsel that the challenged person is, under the discrete facts of that particular case, more likely to favor the other side, which in the ultimate judgment of society may or may not prove to be the side of virtue and right.

Moreover, the operative effects of the peremptory challenge cannot be equated to those of the general exclusion from venire pools. Assuming the prosecution uses its peremptories for the purpose of prevailing in the particular case, and does so intelligently, the jury drawn from a venire representative of all cognizable groups, but from which one group has been eliminated by prosecution group-based peremptory challenges, generally is more likely to be acquittal prone than a jury drawn from an otherwise similar venire that excludes any members of that same group. In the latter instance, unlike the former, the prosecution could eliminate the most acquittal prone of the remaining groups by using peremptory challenges it otherwise would have used to eliminate the group in question. Therefore, inclusion of a group in the venire is not "meaningless" to the end result simply because that group may be eliminated from the trial jury by peremptory challenge. Further, the general exclusion from venire pools allows the prosecutor (and the potential defendant as well) greater ability to predict, in advance of the decision to prosecute, the composition of the jury which will try the case. If no cognizable group is excluded from the venire formation process, the decision to prosecute (or to commit an offense) normally cannot be made with assurance that any given group will not be so represented on the particular venire from which the trial jury will be drawn that it cannot be eliminated by peremptory challenges (or can be eliminated only at unacceptable cost in terms of other peremptories foregone). The prosecution in this case, for example, could not have known in advance that the twenty-eight venirepersons here would not have included nine instead of six blacks, or six blacks and three others whom the prosecution would have felt it imperative to peremptorily strike.

It is, of course, true that if peremptory challenges on the basis of group affiliation as addressed in *Swain* part II were to be prohibited, there might be some indeterminable increase in the number of trial juries whose composition more closely mirrored the community's mixture of all "cognizable" groups. *But see*, note 29, *infra*, and accompanying text. However, such mirroring at the actual trial-jury level is not the "be all and end all" of the jury system as we know and have known it. If it were, we would take steps to more nearly ensure that the composition of each individual jury roughly mirrored the community's group mixture with respect, say, to male and female, "Anglo," "Hispanic," and "Black." [19] Obviously, however, any such approach is completely contrary to the jury system as we understand and have employed it throughout our history. And, as reflected above, the "cross-section" cases are not to the contrary. Indeed, the Supreme Court's decisions that the sixth amendment requires neither juries larger than six nor unanimous verdicts, despite the general practice and long history of a unanimous jury of twelve, *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 1898–1900, 26 L.Ed.2d 446 (1970); *Johnson v.*

**19.** For example, those summonsed for the venire could be classified by these groupings, summonsing to continue until a sufficient number in each group were achieved, with any excess in particular groupings being excused; each jury would be filled by drawing on these groups, with no more than the appropriate number drawn from each; a venireperson removed by challenge would be replaced by one from the same group. Thus, each jury in a given community might be equally divided by gender, and, say, one sixth Black, one third Hispanic, and one half Anglo. Proportions not divisible by the number of jurors might be adjusted for by a method such as the following: if Blacks were twenty percent, Anglos forty-seven percent, and Hispanics thirty-three percent of the community, then juries would alternately be four Hispanic—three Black—five Anglo, and four Hispanic—two Black—six Anglo.

We do not even go so far as to do all we practically can to ensure that each particular *venire* mirrors the community's mixture of such major "cognizable" groups, as the initial step in the above example would tend to accomplish. Indeed, *Duren v. Missouri, supra*, indicates that the sixth amendment's cross-section requirement, even as applied to the presently conventional method of selecting venires, can be diluted on a systematic basis provided only that "a significant state interest be manifestly and primarily advanced" thereby. 99 S.Ct. at 670.

*Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 1623, 1625, 32 L.Ed.2d 152 (1972) (due process); *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972), necessarily bespeak the limited strength of the cross-section principle as applied even to the systematic structuring of the trial jury. Juries of six are obviously much less likely to have minority representation than juries of twelve, and unanimity obviously increases the power of the minority. The Court was plainly aware of these considerations. *See Williams*, 90 S.Ct. at 1906 & nn. 46–47. This is not to say that cross-section considerations were deemed irrelevant to such systematic structuring, but merely that they were not controlling. In respect to the five-person Georgia jury system, the Court in *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 1040, 55 L.Ed.2d 234 (1978), stated that "the question of representation does constitute one factor of several that, when combined, create a problem of constitutional significance under the Sixth and Fourteenth Amendments." Nevertheless, *Ballew* refused to retreat from *Williams*, despite recognition that ten-percent minorities would be wholly without "representation" in over half of six-person juries, as contrasted to less than thirty percent of twelve-person juries. *Ballew*, 98 S.Ct. at 1037.

That factors other than those relating to the cross-section principle are important to the concept of the criminal jury is likewise reflected by the passage in *Baldwin v. New York*, 399 U.S. 66, 90 S.Ct. 1886, 1890, 26 L.Ed.2d 437 (1970), which describes "the primary purpose of the jury" as follows:

"[T]he jury interposes between the accused and his accuser the judgment of laymen who are less tutored perhaps than a judge or panel of judges, but who at the same time are less likely to function or appear as but another arm of the Government that has proceeded against him." (Footnote omitted.)

Similarly, *Apodaca* states:

"[T]he purpose of trial by jury is to prevent oppression by the Government by providing a 'safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.' *Duncan v. Louisiana*, 391 U.S., at 156, 88 S.Ct., at 1451. 'Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen ...' *Williams v. Florida*, *supra*, 399 U.S., at 100, 90 S.Ct., at 1906." 92 S.Ct. at 1632–33.

The United States Constitution does not speak of a "cross section" or "representative" or similarly described jury. Of course, this does not mean that our jury system does not embrace cross-section values, but it does mean that such values are embraced in the context of, and are limited by, the overall concept of trial by jury. That concept, as *Swain* makes clear, includes peremptory challenges, both for individual and group characteristics, when made for the purposes of the particular case being tried. This is likewise evident from *Williams*, where Justice White, responding to the argument that the jury of six impermissibly diluted community cross-section representation, observed:

"Even the 12-man jury cannot insure representation of every distinct voice in the community, *particularly given the use of the peremptory challenge*." *Williams*, 90 S.Ct. at 1907 (emphasis added).

The legislative history of the Federal Jury Selection and Service Act of 1968 also reflects that the value of the cross-section principle in the jury system is not so unlimited and overriding as to warrant restriction of the traditional scope of the peremptory challenge. Pub.L. No. 90–274, § 101, 82 Stat. 54, 28 U.S.C. § 1861 *et seq.* It is to be noted that Justice White, in *Taylor*, refers to this legislation as embodying a proper recognition and implementation of the principle "that the requirement of a jury's being chosen from a fair cross section of the community is fundamental to the American system of justice." 95 S.Ct. at 697. The *Taylor* opinion refers to the legislative history of this Act, including House and Senate Committee Reports. *Id.*

at 697 nn. 7–8. When Congress considered this legislation it was obviously aware of *Swain,* decided only three years earlier. The following from the House Committee Report is hence particularly significant:

> "The act guarantees only that the jury shall be 'selected at random from a fair cross section of the community.' It does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup. Thus, no challenge lies on that basis.
>
> " . . . .
>
> " . . . *It should be noted, however,* that the bill does not change the method of challenging jurors at voir dire. *In particular, the bill leaves undisturbed the right of a litigant to exercise his peremptory challenges to eliminate jurors for purely subjective reasons."* H.R. Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 1792, 1794–95 (emphasis added).

The jury required by the sixth amendment must be "impartial." This is a requirement applicable to each particular, individual jury, in each discrete case. It does not, however, imply that a party is entitled to any representative of his or her "group" on the jury,[20] even where that group is a significant one in the community where the trial takes place and from which the venire is drawn. *Taylor,* 95 S.Ct. at 702 ("[N]o requirement that petit juries actually chosen must . . . reflect the various distinctive groups in the population. Defendants are

not entitled to a jury of any particular composition . . . .").

What the impartiality requirement does imply is a jury *each* of whose members is willing and able to decide the case solely on the basis of the evidence introduced at trial and the instructions of the court. *See Patton v. Yount,* —— U.S. ——, 104 S.Ct. 2885, 2892 n. 12, 81 L.Ed.2d 847 (1984) ("The constitutional standard [is] that a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court. . . ."). While normally only *demonstrated* and almost complete inability to put aside extraneous considerations *requires* that a challenge for cause be sustained, and it is often "scarcely possible to avoid" jurors "whose minds are entirely uninfluenced by opinions previously formed," nevertheless the *ideal* remains jurors who will "stand perfectly indifferent between the parties" and "who fe[el] no bias either way." *Queen v. Hepburn,* 7 Cranch 290, 297–98, 3 L.Ed. 348, 350 (1813). Hence, challenge for cause may properly be sustained in instances where such action is not absolutely required. *Id.* In this connection, it is also recognized that bias— *i.e.,* lack of impartiality in the referenced sense—may arise because of a group characteristic, such as race or religion or other "cognizable" grouping. *See, e.g., Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 472–73 & nn. 1–3, 75 L.Ed. 1054 (1930)[21]; *Miles v. United States,* 103 U.S. 304, 26 L.Ed. 481 (1881); *Queen v. Hepburn, supra; Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46 (1973).[22] Though excusing jurors for

---

**20.** This country has not utilized anything analogous to the ancient common-law rule that an alien was entitled to a jury composed half of aliens and half of citizens. *See United States v. Wood,* 299 U.S. 123, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936).

**21.** While *Aldridge* formally involved the issue of the defendant's race, not that of the jurors, it is unlikely that the question of prejudice against blacks—as in issue there—would arise with respect to a black juror. Indeed, the Court noted that "the members of the jury were white." 51 S.Ct. at 471. Moreover, in support of its holding, *Aldridge* expressly relied on a case where the juror's group affiliation—membership in the

Know-Nothing Party—was at issue. *Id.* at 472–73.

**22.** Though extensions of *Ham* have been rejected in *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976), and *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981), these later decisions nonetheless recognize the not infrequent *desirability*—though less often the inflexible absolute necessity—of inquiry into possible group prejudice of jurors. *See Ristaino* at 1022 n. 9 ("wiser course generally" is to inquire); *Rosales-Lopez* at 1636–37 (approving inquiry into prejudice against aliens). A caveat to the desirability of such an inquiry expressed in the

such bias may reduce the cross sectionalization of the jury, we have recognized that "[a] cross-section of the fair and impartial is more desirable than a fair cross-section of the prejudiced and biased." *Smith v. Balkcom*, 660 F.2d 573, 583 (1981), *modified in other respects, reh'g en banc denied*, 671 F.2d 858 (5th Cir.), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

Plainly, however, the challenge for cause is an inadequate tool for the elimination of bias. To begin with, bias exists along a continuum of strength or degree; its place on that continuum will often be impossible to gauge, and will frequently depend on the circumstances of a particular case. It is impractical—and undesirable—to lay down the sort of general rule implicit in the concept of challenge for cause for any but the clearest and strongest cases. This does not, however, mean that bias of a "lesser" kind has no tendency to undesirably inhibit the juror in the task of deciding the case solely on the evidence and the court's charge. *Cf. Queen v. Hepburn, supra.* It is universally recognized that the peremptory challenge fills an important function in this regard.

Moreover, even if the juror has a bias which would give rise to a proper challenge for cause, this fact may not be demonstrable. This was recognized in *Swain*, 85 S.Ct. at 836, as well as in a host of other decisions. *See, e.g., Hayes v. Missouri*, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887). As the New York Court of Appeals stated in *People v. McCray*, 57 N.Y.2d 542, 457 N.Y.S.2d 441, 443 N.E.2d 915, 918 (1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983):

> "First, jurors may be reluctant to admit their prejudices before spectators or others present in the courtroom during the *voir dire*. Second, certain prospective jurors may evade full disclosure of their prejudices in an effort to avoid being struck from the jury. Finally, other prospective jurors may simply be unaware of the existence of certain biases or prejudices they may harbor."

Further, the availability of the peremptory protects the challenge for cause, by protecting against juror hostility resulting from the inquiry. *Swain*, 85 S.Ct. at 836; *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892). As expressed in *People v. McCray:*

> "Pointed questions directed at an area as sensitive as a potential juror's racial, religious or sexual biases may, even where such biases do not exist, alienate a juror against counsel and his position." 443 N.E.2d at 918.[23]

Thus, the peremptory challenge plays an important role in the parties' quest for the "impartial" jury—the jury of the sixth amendment, composed of those who are willing and able to decide the case solely on the evidence and the law. As *Swain* states:

> "The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties

---

concurring opinion of Justice Rehnquist, joined by the Chief Justice, in *Rosales-Lopez* is the concern that it "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it." 101 S.Ct. at 1638. The three *Rosales-Lopez* dissenters took a broader view of the *necessity* for inquiry into the possible group prejudice of jurors. *Id.* at 1638–41.

**23.** While conduct of *voir dire* by the judge may reduce the potential for hostility, it will not remove it. *See Commonwealth v. Sanders*, 383 Mass. 637, 421 N.E.2d 436, 439 (1981) (questioning along this line " 'may activate latent racial bias in certain prospective jurors or may insult others without uncovering evidence of bias in hard-core bigots who refuse to acknowledge their prejudice' "); *Rosales-Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629, 1638, 68 L.Ed.2d 22 (1981) (Rehnquist, J., concurring; joined by Chief Justice Burger) ("could well exacerbate whatever prejudice might exist without substantially aiding in exposing it").

Moreover, it is to be doubted that questioning by the court will be as effective in an area such as this as questioning by counsel. *Cf. People v. McCray*, 57 N.Y.2d 542, 457 N.Y.S.2d at 444, 443 N.E.2d at 918:

> "The inadequacy of relying upon *voir dire* to filter out all potential biases based upon group affinity is exacerbated by the reluctance of some Trial Judges to permit extensive, time-consuming *voir dire* examination."

that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." 85 S.Ct. at 835.

*See also Lewis,* 13 S.Ct. at 138 ("essential to the fairness of trial by jury"); *Hayes,* 7 S.Ct. at 351 ("to secure the impartiality of jurors"); *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965) ("likely to produce a fair result"). The extent to which a juror's circumstances may affect his impartiality depends on the likelihood of the inference of bias and the strength of the bias inferred, under the facts of a particular trial, but not, *per se,* on whether the source of the potential bias is affiliation with a "cognizable" group as distinguished from all other possible sources. The potential for bias of Catholic against Ku Klux Klan member is not inevitably less in every trial than that of one with long hair[24] against the police.

It has been argued that one party's peremptories may exclude all of a minority group, while the other's peremptories will be insufficient to exclude the majority, with resulting unfairness to the minority party. *See Soares,* 387 N.E.2d at 516. To the extent this reasoning implies that the resulting jury is *actually* unfair to the minority party, any such unfairness is no greater—and in some circumstances is likely to be less, for the reasons previously noted—than that which might exist where the lack of minority representation results from venire composition due to chance, from the paucity of minority residents in the community, from challenge for cause, or from peremptory challenge for "individual" reasons. To the extent that the argument rests on analogy to the cross-section cases, either in their equal protection or in their sixth amendment rationales, it does not take into account the previously noted differences between the venire-formation and peremptory-challenge processes.

As a justification for prohibiting all peremptory challenges based on "cognizable" group affiliation, the "elimination of the minority" rationale is also subject to other objections. "Cognizable" group classifications are not limited to those of minority and majority, but rather include classifications such as gender, national ancestry, religion and economic status, respecting which the divisions in a given community may be approximately equal. Nor has it been suggested that group-based peremptories are permissible against majorities but not minorities.[25] Moreover, the prohibition presumably would extend to peremptories based on minority group affiliation even where that minority group, either because of its chance "overrepresentation" on the particular venire or some other reason, would not be wholly eliminated from the panel or reduced significantly below its proportion in the community.[26] Indeed, the minority might not be reduced below its proportion on the venire.[27]

Finally, the "elimination of the minority" argument implicitly assumes that the mi-

24. *Wheeler* suggests that length of hair is an individual characteristic on the basis of which peremptory challenge may be properly exercised. 583 P.2d at 760.

25. There is no reason to assume that group-based peremptory challenges are only utilized where the challenged group can be wholly eliminated or proportionately significantly reduced. For example, in a given trial setting, group-based considerations, though present and decisive as to one or two challenges, may not be decisive as to any others, where particular "individual" characteristics may be more significant.

26. It may be argued that the minority is "entitled" to its chance "overrepresentation" on the jury, just as it is entitled to its chance "overrepresentation" on the venire. This, however, is an argument for a process, not for a result in a

given case. As an argument for a process, it fails to take into account the previously noted differences between the venire-formation and the peremptory-strike processes.

27. If a twenty-eight-person venire panel has ten "minority" members (about thirty-six percent of the panel), the six prosecution peremptory challenges allowed by Fed.R.Crim.P. 24(b) used against minority members will leave four of the minority. If the defense uses its ten peremptories against the majority, the resulting jury will be thirty-three percent minority, approximately the same as the panel.

The presence of those on the panel with "individually" based attitudes one way or the other may produce a similar result. If there are six of the minority on the twenty-eight-person panel, the prosecution may use three of its perempto-

nority and majority are equally homogeneous and stand at opposite poles from one another with respect to their attitudes in a given case. The argument assumes that if the prosecution strikes minority group members on the basis of their group affiliation, then majority group members inevitably must be as likely to be as conviction prone as the minority group members are acquittal prone. However, this is not necessarily so. To the contrary, as applied to a given situation the feelings among any one group may be strong and nearly unanimous, while among another group there may be substantially more diversity and less intensity of attitude.[28]

With respect to the last-mentioned consideration, a somewhat analogous point is made in Note, *Peremptory Challenges and the Meaning of Jury Representation*, 89 Yale L.J. 1177 (1980). This student note convincingly argues that prosecution group-based exercise of peremptories will tend to distort trial juries away from the mean of the community's relevant attitudes *only* when such attitudes are asymmetrically distributed about the community mean and the challenged group comprises an acquittal extreme more distant from the mean than the conviction extreme. In other situations, the prosecution's use of group-based peremptories will *enhance* the tendency of the trial jury to reflect the mean of community attitudes, while in still others it will have no effect one way or the other on that tendency.[29] Significantly, "[t]here is currently no empirical evidence

ries on majority members based on "individual" characteristics, and its remaining three peremptories on minority members based on their group affiliation. *See* note 25, *supra.* If the defense uses its ten peremptories against members of the majority, the resulting jury will have a slightly higher minority percentage (three of twelve) than did the panel (six of twenty-eight).

28. For example, in a given community the attitudes of blacks toward the Ku Klux Klan may well be nearly unanimous and strongly adverse, while the attitudes of whites may well be much more diverse and generally less intense across the spectrum.

Again, an individual who is prominent in the local black community, as appellant Leslie apparently was, may well enjoy a generally favorable reputation among, or have potential for influence over, blacks of that area, but may have no reputation whatever among, or potential for influence over, any significant portion of the whites. While *voir dire* might disclose some of this, nevertheless some of the venire might not realize until later that this was the man they had previously heard favorably about, or might be reluctant to speak out, or would be more susceptible to a neighbor's chance comments during trial or the like.

29. Note, *Peremptory Challenges and the Meaning of Jury Representation*, 89 Yale L.J. 1177 (1980): "Suppose that the social distribution, correctly reproduced on the venire, is asymmetrical about the mean—that the extremes in favor of acquittal are farther away from the mean than the extremes in favor of conviction. Suppose further that the acquittal extreme is occupied by members of some subgroup. In this case, the normal operation of the peremptory will have a disproportionate impact on members of that subgroup. More important-

ly, it will distort the jury's mean in favor of conviction, because the prosecution's removal of subgroup members will not be fully balanced by the defense's peremptory elimination of pro-conviction jurors....

"On the other hand, the social distribution might be symmetrical about the mean, with extremes on both sides equally far away. If members of a subgroup are again supposed to occupy one of the extremes, the disproportionate removal of that subgroup will have absolutely no effect on the jury's mean impact. The effect of these removals would be fully offset by the removal of jurors at the other extreme. In such a case, a rule protecting subgroups by limiting the peremptory would shift the jury's mean away from that of society, toward the extreme at which the protected group clustered. Under these circumstances, limiting the peremptory would cause the jury to be unrepresentative.... Only if that subgroup is at an extreme of an asymmetrical social distribution will limiting the peremptory protect representation of the community. Otherwise, such a limitation would distort the community mean.

"Numerous other distributions of verdict impact in society can be imagined. In those that are symmetrical but that do not have a subgroup clustered at one end, both the normal and limited peremptory will have no systematic effect on the jury's mean. In those that are asymmetrical but that have subgroups distributed evenly throughout, both the normal and limited peremptory will distort the jury mean toward the nearer extreme. There is currently no empirical evidence as to which distribution exists in any given community for any range of cases. In the absence of knowledge as to the actual distribution for the

as to which distribution [of attitudes] exists in any given community for any range of cases." *Id.* at 1196.

I conclude that the group-based peremptory challenge of the kind considered in *Swain* part II is constitutional, not only under the equal protection clause but under the sixth amendment as well. This conclusion is premised on the understanding that such challenges do not run counter to, but rather form a recognized part of, the mix of values inherent in the concept of trial by jury as provided for in the sixth amendment and article III, section 2, clause 3.

*Supervisory Power*

I recognize, of course, that the majority has not rested its decision on constitutional grounds, but rather on our supervisory power. With all respect, this is merely the same goods under a different label. The same considerations that support or oppose the constitutional challenge equally support or oppose the employment of the supervisory power. "The values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the" sixth amendment. *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 2446–47, 65 L.Ed.2d 468 (1980). Moreover, the numerous decisions that have left intact the prosecution's and defense's unfettered use of peremptory challenges for purposes of the particular case being tried were *not* decided on the theory that although racially based challenges are undesirable or even illegal they nevertheless are not so egregious as to be unconstitutional.[30] Rather, they have been sustained because such unfettered use, including consideration of group affiliation, is an essential element of the peremptory challenge itself and has consistently been recognized as a proper,

important and integral part of trial by jury. Hence the majority's decision here in essence "amounts to a substitution of individual judgment for the controlling decisions" of the Supreme Court and the prior panels of this Court. *See Payner*, 100 S.Ct. at 2447.

The majority has held that "the district court must exercise its supervisory authority to determine whether the prosecutor has considered the veniremen's race in employing his peremptory challenges" (at 374). But, as heretofore pointed out, *Swain* and related cases clearly recognize that there is nothing inappropriate in considering race when the peremptory is exercised for purposes of the specific case being tried. In fact, the same authorities demonstrate that such an inquiry by the court *is* inappropriate. We are, then, condemning what has been approved and directing what has been forbidden.

To revert to *Swain* part II, Justice White describes the peremptory challenge as " 'an arbitrary and capricious right ... [that] must be exercised with full freedom, or it fails of its full purpose.' " 85 S.Ct. at 835 (quoting *Lewis*, 13 S.Ct. at 139). The opinion continues with this significant statement:

> "The *essential* nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." 85 S.Ct. at 836 (emphasis added).

*Swain* also states that to subject such challenges to the kind of equal protection scrutiny that the majority here requires of the district court

> "... would entail a *radical change* in the nature and operation of the challenge. The challenge, *pro tanto*, would no long-

---

geographic community from which a jury is drawn, neither the normal nor the limited peremptory has a predictable, systematic effect on the jury's mean verdict impact as compared to that of society." *Id.* at 1193–96 (footnotes omitted).

**30.** *See United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983):

"The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights [citations omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury [citations omitted]; and finally, as a remedy designed to deter illegal conduct [citation omitted]."

er be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity." *Id.* at 836–37 (emphasis added).

Finally, *Swain* makes clear that to "require[ ] an examination of the prosecutor's reasons for the exercise of his challenges in any given case," even where "all Negroes were removed from the jury … because they were Negroes," is to "establish a rule *wholly at odds* with the peremptory challenge system as we know it." *Id.* at 837 (emphasis added).

The *Swain* dissent similarly eschewed any rule under which "a prosecutor's motives are subject to question or judicial inquiry when he excludes Negroes or any other group from sitting on a jury in a particular case. Only where systematic exclusion has been shown, would the State be called upon to justify its use of peremptories …." *Id.* at 849.

Decisions of this Court are in accord. *See Davis v. United States,* 374 F.2d at 5 ("The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the Court's control."); *United States v. Pearson,* 448 F.2d at 1216 (questioning of prosecutor as to his reasons for exercising peremptories "would be inconsistent with the peremptory challenge system"); *United States v. Carlton,* 456 F.2d at 208 ("The subjective thought process of the prosecutor in deciding which prospective jurors to strike in a given case is beyond inquiry of the Court, trial or appellate …."). Surely in these cases, and in the many other direct appeals of federal criminal convictions where we have

applied *Swain,* we were aware of our supervisory power. Indeed, in *Carlton* we specifically cited *Hall v. United States,* 168 F.2d 161 (D.C.Cir.), *cert. denied,* 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948), in support of our *Swain* holding, and were presumably aware of the *Hall* dissent's express reliance on the supervisory power. *Carlton,* 456 F.2d at 208.

What the majority has directed, then, is what *Swain* and our prior decisions have said *no court can* do. The prosecution has been entitled to peremptory challenges, or their equivalent, continuously since the formation of our nation, as well as for centuries prior thereto under the common law. This right has had express statutory recognition continuously from 1865 until its inclusion in Rule 24(b) of the Federal Rules of Criminal Procedure in 1944, where to this date it has remained unchanged in any relevant particular.[31] As previously noted, Congress in 1968, though obviously well aware of *Swain* and its application in the federal courts, considered but elected "not [to] change the method of challenging jurors" and "in particular" to "leave[ ] undisturbed the right of a litigant to exercise his peremptory challenges." H.R.Rep. No. 1076, 90th Cong., 2d Sess., *supra,* U.S.Code Cong. & Admin.News 1968, p. 1794. Nevertheless, the majority orders a procedure which, as characterized in *Swain,* "entail[s] a radical change in the nature and operation of the challenge" and is directly contrary to its "essential nature," and "wholly at odds with the peremptory challenge system." Surely the *supervisory power* of this panel does not extend to thus riding roughshod over the Federal Rules of Criminal Procedure, the intent of Congress, the rights of the executive, the prior decisions of this Court and of the Supreme Court, and over half a millennium of settled doctrine.[32]

---

**31.** These "pre-verdict" rules must be submitted to Congress during a regular session and are not effective until ninety days after such submission. 18 U.S.C. § 3771. This contrasts with "post-verdict" rules which need not be so submitted. *Id.* § 3772.

**32.** Nothing cited by the majority supports its decree, which can only be described as an "unprecedented assumption of power." *See United States v. Newman,* 549 F.2d 240, 250 (2d Cir. 1977).

Nor do any of the three purposes for the exercise of supervisory power stated in the quotation from *United States v. Hasting,* 461 U.S.

But the majority has done more than eviscerate the prosecution's right of peremptory challenge. It has also either eviscerated the defense's use of peremptories or improperly tilted the scales of justice against the prosecution. Of course, the prosecution is entitled to a fair trial and the defense is not entitled to a jury partial in its favor. Challenges are one means to this end. *See Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 851–52, 83 L.Ed.2d 841 (1985); *Smith v. Balkcom,* 660 F.2d at 579; *Spinkellink v. Wainwright,* 578 F.2d 582, 596 (5th Cir.1978), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979). The prosecution is no less entitled to the unfettered use of its allotted peremptories than the defense. As the Supreme Court said in *Hayes v. Missouri,* 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887), in such matters "the scales are to be evenly held" between prosecution and defense.[33] This view was reaffirmed in *Swain* respecting the same proffered restriction on prosecution exercise of peremptories that is at issue here. 85 S.Ct. at 835. Similarly, in

499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), set out in note 30, *supra,* afford justification for the majority's ruling.

The majority places major reliance on *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). Neither of these cases fairly supports the present result. Most important, *Ballard,* expressly, and *Thiel,* implicitly, rest on the proposition that the practices there condemned constituted "a departure from the statutory scheme." *Ballard,* 67 S.Ct. at 265 (also at 264). *See also Thiel,* 66 S.Ct. at 987 (nothing in "federal or state law" justifies the condemned practice). Here the very opposite is the case: what we decree is "a radical change" from the "essential nature" of a right expressly authorized by the Federal Rules of Criminal Procedure, and impliedly authorized by Congress, and is "wholly at odds" therewith. Further, *Ballard* and *Thiel* are supported by "[t]he American tradition of trial by jury." *Thiel,* 66 S.Ct. at 985; *Ballard,* 67 S.Ct. at 263. Here the majority flies directly in the face of that tradition. Finally, *Thiel* and *Ballard* involved judicial supervision of the judiciary—the Supreme Court supervising the lower federal court-formulated venire summons practice. Here, by contrast, we intrude into decisions committed by law to the executive branch, namely, against whom should peremptory strikes be exercised for the purpose of a particular case. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), is inapposite for all the same reasons.

Nor can the majority properly claim much comfort from the Eighth Circuit's supervisory power decisions. They involve claims that the challenges were of the *Swain* part III variety, and arise out of the Eighth Circuit's "concern because of the frequency with which we have been called upon to examine the prosecutor's practices in this regard in the Western District of Missouri." *United States v. Jackson,* 696 F.2d 578, 592 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). *See also United States v. Greene,* 626 F.2d 75, 76–77 (8th Cir.), *cert. denied,* 449 U.S. 876, 101 S.Ct. 220, 66 L.Ed.2d 98 (1980) ("[O]n several previous occasions black defendants have attacked the conduct of the prosecutor's office in the Western District of Missouri in exercising peremptory challenges against prospective black jurors."). This is made plain from the leading Eighth Circuit case on this point, *United States v. Nelson,* 529 F.2d 40, 43 (8th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976), where the Court affirmed the conviction in reliance on *Swain* (as it has in all other such cases), but stated, "Should the prosecutors' practices ... continue, we are sure that the district judges in the Western District of Missouri will take appropriate action."

Finally, the decision in *United States v. McDaniels,* 379 F.Supp. 1243 (E.D.La.1974), does not support the majority. There, a new trial was granted on the basis of a *Swain* part III claim which was supported by an analysis of the prosecution's peremptory challenges over the past two years combined with black underrepresentation on venire lists. *Id.* at 1248–49. This Court specifically distinguished *McDaniels* on that ground in *United States v. McLaurin,* 557 F.2d at 1077 n. 19.

Here there is not only no proof of prior practice or noncase-specific use, there is no such *claim;* indeed, appellant admits that "there is no pattern or practice in the United States District Court for the Eastern District of Louisiana."

**33.** The full passage in *Hayes* is as follows:

"It is to be remembered that such [juror] impartiality requires, not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.

"Experience has shown that one of the most effective means to free the jurybox from men unfit to be there is the exercise of the peremptory challenge. The public prosecutor may have the strongest reasons to distrust the character of a juror offered, from his habits and associations, and yet find it difficult to formulate and sustain a legal objection to him. In such cases, the peremptory challenge is a protection against his being accepted." 7 S.Ct. at 351.

*Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965), a unanimous Court, speaking through Chief Justice Warren, stated:

"The Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result. This recognition of the Government's interest as a litigant has an analogy in Rule 24(b) of the federal rules, which permits the Government to challenge jurors peremptorily."

Rule 24(b) neither by its terms nor its history makes any distinction between the prosecution and defense with respect to the reasons for which peremptory challenges may be exercised. By what right, then, do we do so?

In this connection, it is to be noted that every jurisdiction which has spoken to the matter and prohibited prosecution case-specific peremptory challenges on the basis of cognizable group affiliation, has held that the defense must likewise be so prohibited. *See Wheeler*, 583 P.2d at 765 n. 29 ("[T]he People no less than individual defendants are entitled to a trial by an impartial jury drawn from a representative cross-section .... [W]hen a white defendant is charged with a crime against a black victim, the black community as a whole has a legitimate interest in participating .... [T]hat interest will be defeated if the prosecutor does not have the power to thwart any defense attempt to strike all blacks ...."); *Soares*, 387 N.E.2d at 517 n. 35 (same; also stating that prohibition would, if properly raised, apply in that case to the "attempt of the defendants ... to strike all veniremen of Italian descent"); *Commonwealth v. DiMatteo*, 12 Mass.App. 547, 427 N.E.2d 754 (1982) (white defendant's attempted peremptory challenge of sole black on venire properly rejected where trial judge was not convinced by

defense counsel's questionable nonracial explanation; the crime was apparently not interracial, but the prosecutor was black); *State v. Neil*, 457 So.2d at 487 ("[B]oth the state and the defense may challenge the allegedly improper use of peremptories. The state, no less than a defendant, is entitled to an impartial jury" (footnote omitted).).[34] *See also United States v. Clark*, 737 F.2d 679, 682 (7th Cir.1984) ("It would be hard to argue that only a defendant should be allowed to challenge racially motivated peremptory challenges.... [T]he prosecutor would be allowed to object to the defendant's making racial peremptory challenges if the defendant could object to the prosecutor's doing so.").

Accordingly, although the majority pretermits the question whether the defense may exercise its peremptories on the basis of race (op. n. 5), its position seems likely to ultimately result in a serious weakening of what the Supreme Court has described as "'one of the most important of the rights secured to the accused,' Pointer v. United States, 151 U.S. 396, 408 [14 S.Ct. 410, 414, 38 L.Ed. 208] ... [1894] ... [t]he denial or impairment of ... [which] is reversible error without a showing of prejudice, Lewis v. United States, supra; Harrison v. United States, 163 U.S. 140 [16 S.Ct. 961, 41 L.Ed. 104] ... [1896]." *Swain*, 85 S.Ct. at 835. No longer, then, may the defendant "peremptorily challenge 'on his own dislike'"; no longer will we follow the rule that whatever "prevents or embarrasses the full, unrestricted exercise by the accused of that right must be condemned." *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894).

Finally, the majority opinion leaves trial judges wholly at sea. It states that there may be justification for taking race into account in such challenges, but gives no guidance as to what kind of justification it has in mind. Nor does it address whether its rule extends to other "cognizable" groups, such as those of national origin, gender, religion or the like. *See Wheeler*, 583 P.2d at 761 ("racial, religious, ethnic, or

---

**34.** The point simply is not addressed in *State v.* *Crespin*, 612 P.2d at 718. *See* note 15, *supra.*

similar grounds"); *Soares*, 387 N.E.2d at 516 ("sex, race, color, creed or national origin"). Indeed, it is hard to see how such an extension can be avoided since the majority relies so heavily on *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), where the excluded group was composed of daily wage earners. Moreover, *Thiel* was a *civil* case. Does the majority's rule also apply there? The inevitable result is that no one—judges, lawyers or litigants—will know which peremptories are allowed and which are not, and virtually all challenges will be questioned. And with the uncertainty there will also come the less-than-candid and the self-deceptive explanations. *See King v. County of Nassau*, 581 F.Supp. 493, 502 (E.D.N.Y.1984).

In sum, the purported exercise of the supervisory power is both unwarranted and unwise.

*Conclusion*

I am unable to agree to the majority's substantial revision of the concept of trial by jury which has so long and so well served our nation and graced the common law. I would not so reconstitute it if I could. Equally important, it is not up to this panel to rewrite either the Constitution or the Federal Rules of Criminal Procedure, or even to so drastically and unjustifiably depart from the Supreme Court's and our own prior precedent. Our well-intentioned adventure may prove as harmful to the values implicit to the concepts of the separation of powers, the judicial function and the rule of law as it does to trial by jury. I therefore respectfully dissent.[35]

---

35. I also dissent from the holding that the trial court did not err in refusing to permit the testimony of Giron's attorney, Moriarty, to show that, as a part of Giron's guilty plea "deal" with the Government, Giron was to testify against Leslie in the pending case, and that Giron so understood the "deal." Such a matter, if shown by the evidence, would obviously be material to Giron's credibility, by establishing a motive for him to implicate Leslie. Giron was indisputably the key prosecution witness. The majority says this testimony was inadmissible because a predicate was not laid as required by Fed.R.Evid. 613(b). There are two answers to this.

First, the main thrust of Moriarty's testimony was what *he told Giron* (and what the prosecutor told Moriarty), *not* what Giron said. Rule 613(b) is only applicable to prior statements made by the witness sought to be impeached. Moriarty would have testified that he did "make it clear to Mr. Giron that his mere willingness to testify in this case wasn't enough, that he had to testify against Mr. Leslie." This was clearly admissible to show Giron's state of mind. "When it is proved that D made a statement to X, with the purpose of showing the probable state of mind thereby induced in X, such as ... having knowledge, or motive, ... the evidence is not subject to attack as hearsay." McCormick, *Evidence* 589–90 (2d Ed.1972). *See, e.g., United States v. Kutas*, 542 F.2d 527, 528 (9th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977); *United States v. Smith*, 550 F.2d 277, 281–82 (5th Cir.), *cert. denied sub nom. Wallace v. United States*, 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977).

Second, although Moriarty *also* would have testified about Giron's prior statements, namely, those clearly indicating that he did so understand the "deal," such testimony was not inad-

missible under Rule 613(b). To begin with, it was not offered for its inconsistency, *as such*, with Giron's trial testimony, but rather as direct and independent proof of Giron's state of mind. It was hence admissible under Fed.R.Evid. 803(3), if it was hearsay at all. *See* McCormick, *supra* at 591 ("This circumstantial nonassertive use of utterances to show state of mind is perhaps most clearly applicable to declarations evincing knowledge ...."), 694–95 (declarations of state of mind). *See also Hilyer v. Howat Concrete Co.*, 578 F.2d 422, 425–27 (D.C.Cir. 1978). I recognize that there is a split of authority on whether the provisions of Rule 613(b) must be complied with in such a circumstance if the declaration also conflicts with the witness' trial testimony. *See* 3A Wigmore, *Evidence* § 1039 (Chadbourn rev. 1970) ("The rule requiring a preliminary warning does not on principle apply to proof of *expressions of bias*, although many courts so extend it." (Emphasis in original.)). *United States v. Lay*, 644 F.2d 1087 (5th Cir.), *cert. denied*, 454 U.S. 869, 102 S.Ct. 336, 70 L.Ed.2d 172 (1981), does not touch that point, for there the only suggested impeaching characteristic was "the inconsistency." *Id.* at 1090. I think the better practice is not to apply Rule 613(b) to this kind of evidence, at least not if the subject matter is brought out in the witness' cross-examination. Finally, it seems clear to me that the substance of Rule 613(b) was complied with respecting Giron. He was repeatedly cross-examined about what Moriarty told him, and denied that Moriarty had ever said he had to testify against Leslie and claimed that that was never any part of the "deal."

Moriarty's testimony clearly should have been admitted.

Finally, I concur in that portion of the majority opinion dealing with the guilty plea letters.